Good morning, and may it please the Court. My name is Matthew Adams, appearing for the City of Burien. I'm joined by Lisa Marshall, the City Attorney. I'd like to reserve three minutes if I could, and I'll keep my eye on the clock. This case is about whether it was arbitrary and capricious for the FAA to rely on a categorical exclusion from NEPA review to avoid preparing either an environmental assessment or an environmental impact statement for a flight path that sends low-flying aircraft directly over the city. Beginning with the plain language of the categorical exclusion itself, the CADEX, it applies to, quote, modifications to currently approved air traffic control procedures conducted below 3,000 feet that do not significantly increase noise over noise-sensitive areas. The problem for the FAA here is that at the time of its decision, there was no, quote-unquote, currently approved procedure for the southbound aircraft. I'm sorry, wasn't the manual procedure, the manual turning procedure, wasn't that the procedure that was in effect? So Your Honor is correct that these aircraft were turned manually. Some of them were turned to the 250-degree heading. Some of them used other headings. The turn was made at various points. And so the result was you had this distribution of aircraft and no neighborhood bore the brunt of the whole air traffic. Was that a, quote-unquote, procedure? We know that it wasn't because it was not included in the so-called letter of agreement, or LOA, between the tower at the airport and what's called the terminal radar, TRACON. So before 2016, excuse me, there was nothing in that letter of agreement that addressed these southbound turboprops. How do we know that in order for some procedure to be a procedure for purposes of the categorical exemption, it has to appear in the LOA? Is there a regulation to that effect? Well, the LOA itself purports to list all of the procedures that pertain to the relationship between the tower and TRACON. So I guess it's theoretically possible that there is an error in the LOA such that it was published improperly and it didn't include all the procedures. Any other procedure is not a procedure? Or does it say this lists all possible procedures? What is the exact language? I don't know that I have that here. Your Honor, I don't believe it says... Can you point me to the language that says that? I don't believe it does say, these are all the procedures that exist between these two and there are no other procedures. Okay. So you would have a... So there's an inference. You're saying that this is just to establish coordination and control procedures. So you're saying there's an inference that if it's not in here, it's not a procedure. Is that the argument? That's right. I mean, they've published this letter of agreement that purports to pull together all of the procedures in one place. And I suppose it doesn't say there are no other procedures explicitly, but I think we can assume... Just help me out here. As a matter of sort of basic English meaning of the word procedure, there was a procedure in place. It was a sort of ad hoc type of situation and for that reason wasn't easily reducible to a formula, but it wasn't as if they were just operating blindly or without any consideration of what went on. They had a way of figuring out when they wanted these planes to turn and when they didn't. Sure. So let me offer two responses to that and I think one goes directly to what you just asked me and the other maybe provides a better answer to your question, Judge Ikuda. If one were to read procedure to mean, as you've suggested, anything that anybody does provided that it is done, essentially, if anything is a procedure, even if it's ad hoc, then we have a problem because this particular categorical exclusion is one subpart out of four. And Kaiser, the Supreme Court, just told us we have to use traditional tools of statutory construction. And one of those traditional tools, of course, is we have to look at the structure of the whole thing and make sure it fits together, right? So this categorical exclusion that, if I could use the shorthand, the modifications categorical exclusion, so I don't have to repeat it over and over, is the third subpart. There's a second subpart that is just to do with flights that are procedures that are under 3,000 feet, but do not route aircraft over noise sensitive uses at all, right? And if we were to accept that anything can be a procedure, even if it's just ad hoc, then I think those two categories collapse on themselves and there's no longer any distinction between them. Well, you know, counsel, I mean, isn't it correct that during the administrative procedure when the FAA described the no action alternative that they said that the no action alternative was the manual procedure? I think that's accurate. So, you know, I'd like to make sure you spend enough time on your argument on the cumulative impact. Sure. Would Your Honor like me to head there now or would you prefer that I... Go ahead to cumulative impact. That would be fine with me. Okay. And maybe I'll just make a note to circle back on rebuttal. So on cumulative impact, the question, of course, is whether the FAA was required to consider the cumulative impacts involving this particular project together with the sustainable airport master plan, which folks referred to as the SAMP. Is that the focus of your cumulative impacts, that there was this SAMP, I'll call it? I don't know if that's what they're calling it. You're not talking about any other planned projects that were in the works? Because I know they did go through a number of projects in their categorical exemption document. That's accurate, Your Honor. I think they listed seven or eight. They were mostly roadway improvement projects. What they did not do was look at anything that was proposed to be done at the airport itself. My understanding is they don't even mention the SAMP. Is that correct? That is accurate, Your Honor. Is that the right way to talk about the acronym? Do people call it the SAMP? That's what I have heard. Okay. Okay, well, I'm going to call it the SAMP. And I have to say, I looked at what I think was cited as the SAMP, and it appeared to be just a plan to make a plan. Was there any actual plan? Because this is just saying, here's how we're going to go to guide the SAMP process and how SAMP goals and objectives will guide the preparation of a plan. So it did not appear that there was a plan in place. Am I wrong? In 2015, I guess, was there a plan or just this plan to make a plan? So, Your Honor, it's correct that we attach to our motion to supplement the record or in the alternative for consideration of extra record evidence, the 2015 technical memorandum. And one thing that I hope Your Honor gets from that technical memorandum is that the SAMP planning process was funded by a grant from the FAA. Now, the process did not end in 2015, however, it continued on. And so one of the other exhibits to our motion was a subsequent technical memorandum that talked about what was going to be included in the SAMP. I think it referred to these things as, quote, unquote, near-term projects. And it was things like a new terminal, new gates, new cargo facilities. So was that one before them? I thought only the 2015 one was before them at the time of this decision. Well, the FAA has agreed that Your Honors may consider both of those. But which was before them? Well, they've taken the position that neither was before them and they didn't consider either of them. Well, the 2015, I guess my question is because the 2015 document, which was the one I focused on because I believe that was what was before them, didn't have any particular plan. It was just a plan to make a plan. So my question was how it rose to the level of being a future project or a reasonably foreseeable future project when it doesn't identify anything of that nature. So can I speak to the timing issue? So you are correct that the date of that final report is marked 2018, May 2018. So that was two weeks after the approval of the project that we're here on. So just one observation is just as a practical matter, it's sort of inconceivable that all of the planning for a new terminal and 20 more gates and this phenomenal buildout of cargo facilities would have happened within those two weeks. But just drilling down on the specifics of what is in that 2018 report, it is filled with maps and plans and descriptions of these new facilities that are all dated 2017. Council, I mean, since the FAA never mentioned the SAMP, they obviously didn't say the SAMP is just a plan to make a plan and is not reasonably foreseeable. They never made any kind of a finding because, as I understand it, they never mentioned it. That's accurate, Your Honor. So this is not one of those cases where there's a dispute about an agency's reasoning for eliminating something from a cumulative impacts analysis here. There's nothing to defer to. There's just a void. And I would just note, in addition, the city asked the FAA to look into future projects at the airport that's at ER 113. And the response to that comment says nothing about future projects at the airport. So I guess that is the cumulative impacts question sort of in a nutshell. There's also the question of public controversy. But if I could just circle back quickly before I lose it. You know, on this question of whether all of the procedures are in the letter of agreement, you know, we think it's worth noting that, you know, the original procedure was adopted in 2016. In the face of litigation, it was withdrawn. And the mechanism for withdrawal was to formally strike it from the letter of agreement so that the letter of agreement, again, served as the register of all of the procedures. And then when it was re-approved, the mechanism was not to place it somewhere else or sort of leave it be on the side because there were other places where other procedures lived, but instead to add it back to the letter of agreement. And so that's another reason why we believe that letter of agreement was intended to be the full roster of all the procedures. Your Honors, I see I'm running fairly low on time here. Do you have other questions for me or should I reserve for rebuttal? I just have one question. My understanding is in the administrative process, the EPA asked the FAA to clarify the extent to which the air traffic is expected to increase and incorporate that into the analysis. That's right, Your Honor. And the FAA's response to that? I believe the FAA's final categorical exclusion document takes the position that there will be no increase in operations. Now, that's for purposes of its environmental analysis. For purposes of justifying the project, of course, the justification is that there will be all these additional operations that we need to accommodate in the future. Thank you. Thank you, Your Honor. Good morning. My name is Erica Kranz for Respondent FAA and with me is Patricia Deem from FAA. Now, the action here was a modest change to the way the departure procedures are handled for 2% of departures from Sea-Tac. The purpose and need of this project was to increase safety and efficiency in the national airspace to help manage the workload of busy air traffic controllers. Now, Burien's trying to import a lot of concepts from environmental analysis and environmental impact statement cases involving much more complicated projects into this case, but this action falls within an established categorical exclusion from that more detailed NEPA review. This is a modification of a procedure that does not significantly increase noise. This was an established category of the type of project that will not normally require more NEPA. What do you say to their argument that this wasn't a modification of a procedure because there was no established procedure in the listing of procedures? So, Burien has sort of taken us off track, I think, by thinking a procedure in a different way than the way that FAA does. So, a procedure is a process by which air traffic control directs aircraft operations and determines where and in what manner they're going to apply. So, procedure usually refers to things like published departure procedures. So, this is going to get a little bit technical, but I'll do my best here. So, for instance, there is a published departure procedure that a lot of turboprops use at Seattle. It's called the Seattle Standard Instrument Departure. And it's basically a set of instructions for departing planes, and it says, take off at the runway heading and then wait for more instructions from air traffic control. That's where this change happened, is within that framework. Previously, those further instructions from air traffic control for this subset of a subset of departing turboprops, those instructions would come after individual coordination between the airport tower and the TRACON. Now, and nearly always, it would result in a 250 heading being issued. Now, that coordination has been essentially eliminated. It's been pre-coordinated that the airport tower will assign a 250 heading. So, within the departure procedure that these departing turboprops are flying, this is changing basically the way that that's implemented, the way that they're receiving and the timing when they're receiving their heading, their turn after they take off. Cancel. You said that this affects 2 percent of the SeaTac departures? That's right. How many flights a day is that? Sorry, I don't know. So, it's going to depend. Whether you have the north conditions or not. Right. So, north flow occurs about 30 percent of the year. So, if the airport's in south flow, it will affect zero flights on that day. If it's in north flow, I'm sorry, I don't have a number for you, but on average over the course of the year, 2 percent. But that's 2 percent of the turboprops or 2 percent of all departures at the airport turboprops and jets? 2 percent of all departures, including jets. We know that under the categorical exemption guidance, you can't rely on a categorical exemption if there are extraordinary circumstances, which include that directly, indirectly, or cumulatively it creates a significant impact. And so, why in making the determination that there weren't extraordinary circumstances, why didn't the FAA look at projects that were in the works in the SAMP process? Well, as you mentioned during question earlier, really, at the point that they were conducting this analysis, there were no real projects here that had been seriously proposed. Everything was still in planning. So, FAA and the Port of Seattle had not yet even issued their scoping documents for their environmental review. There's a technical memo about possible projects that, by the way, wasn't published yet at the time that FAA even issued its decision here. So, they didn't know if or when these projects would occur. They didn't have the type of information about things like the number of flights. So, my issue on the SAMP is, okay, so maybe this was something that was just chaff in the wind, that nothing's going to happen, but why wouldn't the FAA say that? I mean, what would have been the burden on the FAA to just simply say, the SAMP is irrelevant to our statutory duty to consider cumulative impacts because it really doesn't propose anything? I mean, especially given that this was funded in part, at least, with FAA money, and it was being done in consultation with the FAA. What would have been the burden on the FAA to just say, well, this really is nothing that we need to consider? I suppose that's no great burden. But also, Burien points to page 113 of the excerpt saying that they raised the SAMP, and we never responded. They don't raise the SAMP. They make a vague reference to other airport projects. And I don't think it's enough to put the FAA on notice that that's what they were talking about. So, I mean, I guess FAA could have speculated that that's what Burien was talking about and responded there. What's the current situation, if you know of any of those projects going forward? I believe FAA is currently doing an EA for at least some of those SAMP projects. I don't know the full scope of what they're considering. So I asked the opposing counsel about the timing of when the decision was made on this categorical exemption as opposed to the SAMP timeline. And their argument, as I understand it, is that based on the timing of the second document, which does identify specific projects, the FAA must have been aware that those projects were pretty close to being proposed during the period of determination of the categorical exemption. Do you agree with that? I mean, I guess this decision was published in April 2018. The memo that they're citing was from May 2018. So I suppose the memo was in development. But there weren't the cases that Burien is relying on about where agencies were required to consider things that were in development or that had been proposed. These are cases like in the Northern Plains case where it was well-known and projected, for instance, how many methane wells there were going to be over a 20-year horizon. There was the type of actual numbers that court said that allowed meaningful consideration of those other proposed effects. In the Earth Island case, the agency had acknowledged that there's an owl living right over there in the next national forest and then said they didn't really have to consider that. I mean, these are cases where, well, first of all, they're EIS cases. So we're talking about a true cumulative impacts analysis in those cases. Those are cases where there are actual numbers allowing for meaningful consideration. There just isn't that kind of information available that would allow a meaningful consideration of how the impacts of this action, which are de minimis, how they would interact with possible effects of other possible proposed plans. I'm sorry. Go ahead. You know, when you say de minimis, I mean, I suppose that's in the eye of the beholder if you have a bunch of extra turboprop planes flying over your business or your area at 7 in the morning or 6 in the morning. Right. I'm using that as sort of a term of art, actually, because FAA has these established noise thresholds, and they involve some averaging. I understand that when you hear a turboprop going right over you, that can be disturbing, but FAA has these established by regulation that have been accepted by this court, established ways of measuring noise that averages over the day. It gives more weight to noise that occurs at night, and it's basically a way to try to objectify, take an objective look at the total amount of noise that an area sees. When FAA looked at this, it actually did two different noise analyses for this project. The first looked at just noise from turboprops, and that analysis sort of zoomed in on the expected effects of this action and sort of exaggerated the effects, and they saw essentially no either significant noise increase or a lower level. That's called reportable noise increase. They did a second noise analysis where they looked at the total aircraft noise in this area, and that also showed no changes at all, nothing significant, nothing reportable. So I don't mean to downplay the subjective experience of people hearing turboprops, but applying the accepted objective noise measurement thresholds here, it doesn't rise to that level. We have some cases, Seattle Community Council and Morongo Band of Mission Indians, and the last one was Barnes, I think, which effectively say that a change in flight patterns don't have a significant impact, don't have a growth-inducing impact. How did those affect our analysis here? I think Seattle Community Council Federation is extremely helpful. I mean, that project was different than the one here in that it was much broader in scale, but it was similar in that it was being driven by the need for safety and efficiency in the face of increasing numbers of operations at the airport. So the agency explained that, yes, growth at the airport was an impetus for the action, which was sort of the rerouting of a bunch of turboprops, but because the project was not designed to increase growth or sort of create more capacity for more flights to be scheduled, this court agreed that FAA didn't need to study that growth. Was the court looking at cumulative impacts or indirect effects? I believe it was looking at, you know, I'm sorry, I don't remember how they sort of worded it. I think those two concepts almost merge in this area. I want to distinguish Seattle Community, because I think that case is extremely similar to this one, and there's no reason to deviate from it here. But two of the cases that Burien's relying on are quite different, and I want to explain why. So one, the Ocean Advocates case, that was a project meant to increase capacity. So this was at a dock, I believe, a new pier. So they had to study growth in that example. Davis v. Coleman, another one where the purpose of a highway project, an interchange upgrade, was to allow access, to improve access, to allow for, create additional industrial growth in an area, and so they needed to study that growth. That's not what this project is about. This project is about helping, giving air traffic controllers a new tool to help manage their workload, and the FAA has no way to control how many new flights that the airlines schedule, and it doesn't believe that this modest change that applies to 2% of departures will cause the scheduling of additional flights. And so the FAA could theoretically say, even if we're considering the SAMP as something that's going to happen, we understand there are going to be these increased flights, we understand there are going to be increased turboprop flights, but we don't find the cumulative impact significant, or if they had to go further, they could talk about the importance of the safety factors. That's right. That's right. Yes, I mean, recall, we're spending a lot of time, Burien has spent a lot of time, and it's brief, citing these EA and EIS cases that do involve, like, a full environmental impacts discussion. This is a CADEX. So what is supposed to happen with the CADEX is the agency determines that the action falls within the established category and then does a quick check to make sure none of the extraordinary circumstances are implicated. What FAA has done here goes far beyond that and, unfortunately, it seems like the additional documentation has almost opened it up to additional criticism, but this far exceeds what you normally have in a CADEX situation, and Burien has not identified anything about this decision to use the CADEX or the analysis supporting it that was arbitrary and capricious. If there are no further questions? Apparently not. We ask that you deny Burien's petition. Thank you, Your Honors. Just a few very quick points. So on this question of whether this is a, quote-unquote, limited change, as counsel has suggested, we would suggest comparing ER-55 and ER-56, which provide a visual representation of the change that was affected. On the question of whether the SAMP documents were published and when, of course publication is not the standard. The standard is reasonable foreseeability, excuse me. And, again, as you mentioned, Judge Bennett, we did suggest that they look into this. There's been the assertion that our suggestion was just... Did you specifically mention the SAMP? They argue that you did not. Your Honor, let me read you the exact language. So we say, quote, the draft PEA, that's the preliminary document that they made available, fails to evaluate indirect and cumulative impacts. That failure is significant in light of capacity-enhancing future projects planned for the airport. So we didn't use the acronym SAMP. I don't think we knew the acronym SAMP at that point, but we were clearly pointing towards that. And it's hard to imagine that the FAA wouldn't have known what we were talking about given that they were funding that planning process. On what the status is, Judge Rakoff, so we have April, the project was approved. May, that technical memorandum that contains the 2017 plans for the new terminal and all the gates and all the rest of it was formally published two weeks after this decision. Then in July, so about two months after this decision and around the time we were filing this petition for review, the FAA goes public with the formal initiation of environmental review for the SAMP. And that process is running now. And the near-term projects that are proposed include things that were in that technical memorandum that's dated May 2018. On the notion that there's some difference between cumulative impacts analysis in an EIS and cumulative impacts analysis elsewhere, keep in mind that it's the agency's own NEPA procedures that require it to And we've cited cases in our – we've got the relevant citations in our brief. On the question of safety, there's – down to the end. On the question of safety, in our brief we explained that there is no current safety issue. The FAA has admitted that. It's only a question of accommodating these additional operations in a safe way. Okay, you're over your time. Thank you, Your Honor. Thank you. We appreciate the arguments of both parties. In the case of City of Buran, the Elwell and the Federal Aviation Administration is submitted and will next hear argument in Block Tree Properties LLC versus Public Utility District No. 2 of Grant County.
judges: Ikuta, Bennett, Rakoff